IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 4, 2004 Session

IN RE: A.R.G.

Appeal from the Juvenile Court for Davidson County
No. 2119-62535    Betty Adams Green, Judge

No. M2004-00894-COA-R3-PT - Filed February 25, 2005

The trial court terminated the parental rights of both parents of A.R.G., DOB 12-26-2000. Only Mother, C.S., appeals. Grounds for termination were substantial noncompliance with a permanency plan and failure to remedy conditions in her life permitting the child's return in the near future. We affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Thomas H. Miller, Franklin, Tennessee, for the appellant, C.J.S.

Elizabeth C. Driver, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services.

Susie Piper McGowan, Nunnelly, Tennessee, guardian ad litem for A.R.G.

OPINION

A.R.G. was placed in custody of the Tennessee Department of Children's Services under an Order of the Juvenile Court of Davidson County, Tennessee, entered on August 26, 2002, finding her dependent and neglected. On October 22, 2003, the Department filed a Petition to Terminate Parental Rights of the biological father, R.G., and the biological mother, C.S. Grounds asserted in the Petition were abandonment, failure to comply with the requirements of permanency plans and failure to remedy conditions such as would prevent the child's safe return to the care of respondents. Following a hearing on January 30, 2004, the juvenile court entered an Order on February 20, 2004, terminating the parental rights of both parents and finding that termination was in the best interest of the child. Grounds for termination as to Father were abandonment pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i) and noncompliance with the permanency plan. The parental

rights of Mother were terminated under Tennessee Code Annotated section 36-1-113(g)(2) because of noncompliance with a permanency plan and under Tennessee Code Annotated section 36-1-113(g)(3)(A) for failure to remedy conditions that led to the child's removal so that the child could be safely returned to the parent in the near future. No adjudication was made by the trial court as to the asserted grounds of abandonment by Mother. Mother, C.S., filed a timely appeal.

There is little dispute as to the facts of this case, and the findings of fact by the trial court are amply supported by clear and convincing evidence. Said the trial court:

[A.R.G.] was born out of wedlock to [C.S.] on December 26, 2000, in Davidson County. While no one is listed on the birth certificate as the father, [R.G.] admits he is the child's father.

The Putative Father Registry maintained by the Department of Children's Services has been consulted and no response was received. To Petitioner's knowledge, no one has lived openly with the child holding himself out as the father of the child at the time of removal or commencement of these proceedings. No one has entered into a foster care plan with the Department of Children's Services ("DCS") as father of this child. To Petitioner's knowledge, no one has made a claim that he believes he is the child's father to the child's biological mother, DCS or any one else involved in the care, placement or supervision of [A.R.G.] There are no other persons entitled to notice pursuant to T.C.A. § 36-1-117 of this proceeding or of any subsequent adoption proceeding with regard to this child

[A.R.G.] was safety [sic] placed with a relative on August 12, 2002 and after the relative could no longer care for her, [A.R.G.] came into the custody of the Department of Children's services. She was then placed with S.B., her great-aunt, but remained in DCS custody. On September 9, 2002, a permanency plan staffing was held and the tasks listed for mother to complete to be reunited with [A.R.G.] were:

1. Provide proof of domestic violence counseling.
2. Provide proof of Alcohol and drug assessments and submit to random drug screens.
3. Complete parenting classes geared towards toddlers.
4. Maintain stable housing for at least six months.
5. Maintain full time employment.
6. May be assessed child support.
7. Maintain regular supervised visits with the child.

Since [R.G.] acknowledged he was the father of [A.R.G.], the Department of Children's Services needed to include him on the plan if he were to effectively and safely parent the child. The tasks for [R.G.] included:

-2-

1. Complete incarceration.
2. Complete twenty-six (26) weeks of a Domestic Violence program.
3. Undergo an Alcohol and drug assessment and submit to random drug screens.
4. Maintain stable housing for at least six months.
5. Maintain employment for at least six months.
6. Complete parenting classes for toddlers.

[C.S.] was present at the staffing and helped develop it. She signed the plan, indicating that she agreed with the plan and understood her responsibilities under the plan. The Court finds the permanency plan requirements were reasonably related to what brought the child into care. Ms. Connie Swann, the DCS case manager met with the father in November, 2002 and explained the plan to [R.G.] On December 5, 2002, Ms. Swann wrote the mother a letter reiterating the mother's responsibilities relating to the plan and gave her the name and telephone numbers of organizations that could assist her in reaching the goals outlined. On January 27, 2003, DCS case manager Connie Swann wrote another letter to the mother outlining the same programs and/or organizations.

Testimony by Connie Swann detailed the random drug screens performed on the mother. They were as follows:

> September 23, 2002 - Positive for cocaine.
> October 11, 2002 - Called and did not show.
> December 3, 2002 - Positive for cocaine.
> January 28, 2003 - Called and did not show.
> March 7, 2003 - Positive for cocaine.
> April 14, 2003 - Called and did not show.
> August 19, 2003 - Asked to submit to a drug screen, [C.S.] refused because she said she would be positive for marijuana.
> November, 2003 - [C.S.] came to DCS and wanted to give a drug screen; it was negative, but not random.

During this fourteen month time period, from September, 2002 to November, 2003, mother had been enrolled in the following drug rehabilitation programs:

- September 9, 2002 – Pathfinders Intensive Outpatient, discharged on October 2, 2002 for unexcused absences.
- December, 2002 – MADAP Intensive Outpatient, tested positive for cocaine after 16 sessions. Recommended for 28 day residential treatment, [C.S.] discontinued after 21 days.
- January 15, 2003 – case transferred to MADAP's Outpatient program. On February 13, 2003, [C.S.] determined to be non-compliant with that program because of non-attendance.

- October 23, 2003 – [C.S.] entered yet another drug program at Tennessee Christian. She stated she has completed twenty six (26) sessions, but she just didn't get a certificate. She is currently in aftercare.

When asked by the Court if she would submit to a random drug screen on the day of the termination trial, [C.S.] readily agreed. However, she was unable to produce enough urine to test the sample. [C.S.] was instructed to remain at the courthouse, drink more fluids and resubmit another urine sample to be analyzed for drugs. Nonetheless, [C.S.] left the courthouse before giving another urine sample.

Ms. Swann was unsuccessful in her attempts to get [R.G.] screened; he stated it was the mother's fault she was in custody.

Sometime in September or October 2002, the mother, [C.S.], attended the Metro Police Department Domestic Violence program. Kim Page was her counselor. [C.S.] never admitted any domestic violence problems, which would allow her to work a plan. The mother would agree she needed to do this, but never would. Approximately six months later, in April, 2003, [C.S.] was hospitalized for being a victim of domestic violence. She reported to the Foster Care review Board that [R.G.] had hit her when she asked him to buy Easter clothes for the child.

Since the child came into custody on August 26, 2002, the following dates were scheduled for the mom to visit with her daughter (with the exception of June and July, 2003, when the mother requested no visits):

> September 5, 2002
> September 14, 2002 (mom - no show)
> September 27, 2002
> October 6, 2002
> November 11, 2002 (mom - no show)
> November 18, 2002
> December 2, 2002
> December 22, 2002
> December 27, 2002 (mom - no show)
> January 12, 2003
> January 27, 2003 (mom - no show)
> February 13, 2003 (mom cancelled)
> February 25, 2003 (mom - no show)
> February 27, 2003 (mom - no show)
> March 1, 2003 (mom - no show)
> March 3, 2003
> April 3, 2003 (mom - no show)

April 4, 2003
April 26, 2003 (mom - no show)
May 4, 2003
May 10, 2003 (mom - no show)
No visits for the month of June, 2003
No visits for the month of July, 2003
August 4, 2003 (mom cancelled)
August 9, 2003 (mom no - show)
August 21, 2003 (mom no - show)
September 14, 2003 (mom - no show)
October 4, 2003 (mm[sic] - no show)
October 11, 2003 (mom - no show)
October 14, 2003 (mom - no show)
October 25, 2003
November 5, 2003 (cancelled by DCS)
November 15, 2003
November 22, 2003
December 6, 2003 (canc. foster mom)
December 20, 2003
December 27, 2003
No visits in January, 2004

The mother did not visit, or request a visit, with the child in June and July of 2003. There have been no visits in January, 2004. She went over five (5) months without seeing [A.R.G.] from May 4, 2003 until October 25, 2003. [R.G.] visited with the child on January 7, 2002. Another visit was scheduled, but the father did not attend.

[C.S.] has three (3) other children besides [A.R.G.], of whom she does not have custody. She sees one child occasionally and sees another one every other day. [C.S.] testified she is going to enter a three month job training program through Goodwill sometime in February, 2004, but doesn't know if she is going to be paid. Even though she does not have any type of disability, the last time she worked was in 2002. According to [C.S.], one reason for not working was not having a car and another reason was she was busy working her permanency plan. The Court finds that reason hard to believe because she was still testing positive for drugs in August of 2003, she was hospitalized in April, 2003 for domestic violence and, by her own admission, she has still not completed her parenting classes that she started in February, 2003. Although the mother was not under a court order to pay child support, child support was being deducted from [R.G.]'s pay and paid to the mother as late as September 11, 2003, thirteen (13) months after child came into custody. The mother did not forward this money to DCS. The mother testified that she and [R.G.] are no longer together. Mother is currently living in a two (2) bedroom

apartment at Settle Court. The Settle Court apartment lease, that has [A.R.G.] listed on it, was submitted into evidence. [C.S.] is currently in a weekly support group for women in bad relationships and how to avoid them in the future and has also started attending an aftercare program the month of January, 2004. [C.S.] stated she and [R.G.] have been separated for about two (2) months and stated the last time she saw him was at a visit, although further testimony indicated he hasn't visited the child.

Ms. Brooks, the custodian and great-aunt of the child, has a fifteen (15) year old and a twenty (20) year old with whom the child has bonded and them with her. [A.R.G.] refers to Ms. Brooks as 'mama'. Ms. Brooks testified she does not have a problem with [C.S.]; they occasionally talk and visit. Ms. Brooks would like to adopt [A.R.G.].

The grounds for termination of the parental rights of Mother were substantial noncompliance under Tennessee Code Annotated section 36-1-113(g)(2) and persistent conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3). "The existence of either one of these statutory grounds will support a termination of parental rights." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Appellant does not dispute, and indeed concedes in brief, that the requirements of the parenting plan relative to the mother successfully addressing domestic violence issues and successfully addressing her drug addiction are reasonable and related to remedying the conditions that resulted in foster care.

The trial court held:

The Court finds by **clear and convincing evidence** there has been substantial noncompliance by the parent or guardian with the statements of responsibilities in a permanency plan or plan of care pursuant to the provisions of title 37, chapter 2, part 4 in that the mother continued to test positive for cocaine throughout the majority of 2003; admitted in August of 2003 that she would test positive for marijuana; was hospitalized in April, 2003 for domestic violence; has entered at least four drug rehabilitation programs; has not completed parenting classes, and, since the child came into custody, has lived at three different addresses: Oak Court, Myrtle Street and Settle Court. She is currently unemployed. As previously outlined in the visitation schedule, from September 5, 2002 through October 14, 2003, [C.S.] missed 64% of the visits, 18 out of 28. She did not request any visits in June and July of 2003, and went over five months without seeing the child, from May, 2003 until October, 2003. She has not had any visits in January, 2004.

Mother filed a timely appeal.

This Court has held:

In reviewing termination decisions, this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.,* No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn.Ct.App. May 26, 1999) (*no perm. app. filed*); *Department of Children's Servs. v. Darr,* No.03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar. 24, 1998) (*no perm. app. filed*); *Department of Human Servs. v. Manier,* No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any of the bases found by the trial court. *See M.C.G.,* 1999 WL 332729, at *5; *Darr,* 1998 WL 128874, at *3; *Manier*, 1997 WL 675209, at *5; at *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn.Ct.App. Mar. 27, 1998) (*no perm. app. filed*).

This court recently attempted to describe the clear and convincing evidence standard, explaining that

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C.Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622

> S.W.2d 438, 441 (Tenn.App. 1981); *Brandon v.*
> *Wright*, 838 S.W.2d at 536.
>
> *M.C.G.*, 1999 WL 332729, at *6 (quoting *Bingham v. Knipp*, No.
> 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn.Ct.App. Feb.
> 23, 1999) (*no perm. app. filed*)).

*In re C.W.W.*, 37 S.W.3d 467, 473-74 (Tenn.Ct.App. 2000), *perm.app. denied* (Tenn. Nov 20, 2000).

Able counsel for the mother raises little question but that, as of October 22, 2003, when the Petition to Terminate her parental rights was filed, the evidence was clear and convincing as to both substantial non-compliance and persistent conditions. Mother asserts, however, that between the filing of the Petition for termination on October 22, 2003, and the hearing on the Petition on January 30, 2004, her lifestyle had markedly improved. A.R.G. was 20 months old in August of 2002 when she was placed in custody of the Tennessee Department of Children's Services under a dependency and neglect order. From that date until August 19, 2003, on random testing Mother repeatedly tested positive for crack cocaine. From September 9, 2002, through January 15, 2003, she entered three drug rehabilitation programs and was discharged from all of them because of continued drug use. During all this time, she continued to live with her domestic abuser and, as late as April 2003, was hospitalized for being a victim of domestic violence. The record does not indicate that she has any type of disability, yet as of January 30, 2004, she had been unemployed for two years.

While Mother continued her drug-related lifestyle and did precious little to either follow her Permanency Plan or alter the conditions which led to the removal of her child, A.R.G. was bonding with her foster parents to such a degree that she hardly recognizes Mother. Efforts made by DCS to assist her during this time were fruitless, as she either could not or would not do what was necessary to sustain a meaningful relationship of parent and child. Her new-found reformation is simply, in the words of the guardian ad litem, "too little-too late". *In re A.W.*, 114 S.W.3d 541 (Tenn.Ct.App. 2003); *State v. Pruitt*, No. M2000-00416-COA-R3-CV, 2000 WL 827957 (Tenn.Ct.App. June 27, 2000).

While the right of a natural parent in a termination proceeding is a fundamental one and may not be abridged in the absence of clear and convincing evidence, *Santosky v. Kramer*, 455 U.S. 745, 748, (1982), it is not an absolute right. The evidence presented in this case is clear and convincing as to both failure to follow the permanency plan and persistence of conditions that led to the child's removal.

The question is not whether the Department of Children's Services failed to make reasonable efforts to make it possible for the child to return home, but "[w]hether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn.Ann.Code § 36-1-113(i)(2) (Supp. 2001). A.R.G. has spent more than half her life in foster care and has bonded to her foster parents. Surely, at some point, her interest must take precedence over giving

her natural parent "another chance" after that parent has repeatedly failed to address problems, which are, after all, parental problems with the child being only the victim.

The existence of grounds for terminating parental rights does not end the inquiry. DCS, further, must establish by clear and convincing evidence that the termination of the parents' parental rights is in the best interest of the child. Tenn.Ann.Code § 36-1-113(c) (Supp. 2001). In determining the best interest of the child, the court must consider the statutory factors providing:

(1) Whether the parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn.Code Ann. § 36-1-113(i) (Supp. 2001).

The trial court determined that the best interest of the child would be served by terminating the parental rights of Mother. Clear and convincing evidence supports this action by the trial court. Mother has not made an adjustment as to circumstances, conduct or conditions as to make it safe and

in the child's best interest for her to be in the home of her parent. Mother has shown no lasting adjustments. She has not maintained regular contact with the child and has no meaningful relationship with the child. By the testimony of Mother, "She doesn't call me mother. No, ma'am, she does not. Matter of fact, when I called her the other day, she called me grandma." The evidence is undisputed, even by Mother, that A.R.G. has bonded with her foster parents.

Clear and convincing evidence establishes both grounds for termination and that termination is in the best interest of the child.

DCS also asserts that the record supports a finding of abandonment as a ground for termination of the parental rights of Mother. The trial court should have addressed the issue of abandonment since it was asserted by DCS. Since we have affirmed the termination of parental rights on other grounds, remand on the abandonment issue would only delay final resolution of this case, and we decline to remand for this purpose.

The judgment of the trial court is in all respects affirmed. Costs of appeal are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE